Good morning. May it please the Court. My name is Amanda Ulrich, and I am here on behalf of Appellant Katie Mayes, as well as her children, who are parties to this action. I would like to reserve three minutes for rebuttal, please. In this case, we have Katie Mayes, who is a 12-year employee of Winco. She had excellent performance. She was promoted to the PIC, person in charge of the freight crew, while Mark Wright was the store manager. And Dana Steen took over subsequently. And over time, Katie Mayes realized that Ms. Steen was acting harshly towards her. Ms. Ulrich? Yes. We've really thoroughly prepared, so we know the facts. Right. Can I direct you to the area that I'd like to hear your comment on? Please, yes. All right. And that is, what evidence is in the record with regard to Ms. Steen's role in the termination decision? Sure, Your Honor. So as far as what is in the record with regard to Ms. Steen's involvement in the termination decision, first and foremost, we have Ms. Steen's own testimony from the unemployment hearing. And at that hearing, she said that she was involved in the decision to terminate Ms. Mayes. Is it the hearing? Is it the administrative appeal? I want to make sure I've got the record right. I'm looking at ER 273. Is that where you want me to look for that? I believe so. That sounds correct to me. The testimony is that Steen says that she participated in the termination, correct? That's correct. That's correct. So that was the testimony under oath at the unemployment hearing. Thank you. Correct. And can you ---- did she give any elaboration on what she meant by participated? She did not at that time. However, there is additional evidence in the record of her involvement, including Winco's own discovery responses stating that she was involved in the decision to terminate Mayes, as well as Steen's own testimony that she had conversations with Mr. Samuelson, both before he came over to conduct further investigation of the cake issue, as well as after she had left on vacation. She acknowledged she had had a couple of phone calls with him subsequently. And did we get into any of the details of those conversations as to who said what to whom? We did not, however. And I think that was a function of Ms. Steen stating, I do not recall for a number of questions related to that. However, there's still this problem of her involvement from the get-go and the cat's paw theory under Staub. And so even if you remove her from the decision-making process, there is no doubt that she is the one who initiated this investigation as against Mayes. Well, I mean, I'm looking at these interrogatories, and after they get done saying that they object to the phrase decision to terminate as ambiguous, et cetera, et cetera, they go on to identify Ms. Steen, and they say the following people participated in some manner in the decision to terminate. And then they go on to name a series of people, including Ms. Steen. Was there any other further or different evidence offered by WNCO that she didn't participate? I'm sorry, that she did not participate? Right, that she did not participate. I mean, everything I see says she participated. It's not elaborated, but is there anything that says she didn't participate? I don't believe so. I mean, I think there's no doubt that she was part of this process from the beginning, and she was the one who chose to include Mayes in the investigation. So I think it's pretty clear that she had, at a minimum, involvement from the initiation of the investigation, but I also think there's significant evidence in the record of her active participation in the decision-making process. Was she asked on deposition, essentially, did you make the decision to fire her? She was, and what she stated was, and that was in the context of Scott McCartney and him being the individual who actually did the firing, right? And so when she was asked, did you direct Scott McCartney to terminate Ms. Mayes, she just said, I don't recall. She didn't say no. So I think that's indicative of the fact that, you know, there's a question of fact as to did she actually direct that termination. Interrogatory 16, where they're asked, please identify all individuals who participated in the decision, and she's listed. She's listed. There's five individuals listed. Number four, Dana Steen. Right, yeah. So Dana Steen's there, and I believe Don Hook, Scott Samuelson, Karen Stinger from HR, and one other individual I can't. Scott McCartney, Dana Steen. Thank you. Yes, the one who actually did the termination. Assistant store manager, yeah. Thank you. Yes. So I think that's clear error. There are so many questions of fact as to who actually made that decision, and Steen's involvement, and that is so critical, obviously, because of the comments that she's made regarding Ms. Mayes, saying that she did not want a male in the role of the chair of the employee safety committee. She directly stated that to Ms. Mayes. And then also the comment that she didn't want a girl running the freight crew, that she wanted two boys running the freight crew. And so that, I believe, shows direct evidence of discriminatory animus. I don't know how ---- The district court called those stray remarks, right? Yes, the district court did call those stray remarks, and I'm not sure under what scenario you can say those are stray remarks. If you look at ---- Your position, I don't mean to interrupt you, but is your position that those are direct evidence or that those remarks are circumstantial evidence? Well, I think they can be considered under the pretext analysis as well, but I do believe they are direct evidence that can be relied upon to preclude summary judgment in and of itself. And in Dominguez-Curry, actually, it's noted that even a single comment from a supervisor who's involved in the termination that is indicative of discriminatory animus is enough to preclude summary judgment. How many comments were there here? So here we have the comment when Rodney White replaced Ms. Mayes as the safety department chair, and Ms. Dean said she did that because he was male, basically. And then we have twice where Scott McCartney made these statements to Ms. Mayes that Steen didn't want a girl running the freight crew, that she wanted two boys, and that's why she was acting the way she was toward Ms. Mayes. So I appreciate that you're paraphrasing. There's also the children remarks. Yes, and the comment about the children, the children. So, and I guess ---- So is that three or are we missing any? I just want to make sure I've got them all. I think you've got them. There's so both the comments about basically a male being better in whatever position she's referring to. Uh-huh. And then the comment about the child care, which may be more sort of a, you need more context to understand why that's discriminatory, knowing that Mr. Olson would likewise leave to deal with child care duties, but he never got the pushback that Ms. Mayes did about it. But I believe certainly there's absolutely direct, those comments are direct evidence. They're not stray remarks. You don't need extra context to understand that we're referring to Ms. Mayes being female in her role as freight crew supervisor. Counsel, this may go to ultimately how the finder of fact will resolve the case, but it seems to me that the toughest fact that you have for trial is that they also fired the male employee at the same time. Is that relevant at all to the question as to whether or not the firing of the female was pretextual? I don't, because I don't think Mr. McAnally was a comparator. And the reason for that is Ms. Mayes, he took a cake off the shelf. Yes. Instead of a stale cake. Yes. Sorry. I get a little too excited here. I thought the record was that she had taken over the years both fresh and stale. The only difference was how it was recorded in the store log. Correct. Correct. So the process changed at the request of the bakery. So whereas previously when she had been told by Mark Wright how to engage in this process was take a cake off the shelf, put it in the in-store use log, and then it could be used to help motivate the freight crew on days when they didn't want to stay late or, you know, those sorts of things. But subsequently when the bakery asked her to just take something out of the stales cart, the action of putting the cake in the in-store use log was stopped because it was basically messing up the inventory process. Because it had already essentially been written off. Correct. Correct. And I would also note that Ms. Mayes testified and specifically noted when she asked Mr. McAnally to get cakes, she said take them from the stales cart. And that was always the case. Continued to take them from the bakery. Correct. So what was the evidence that she took any fresh cake? Well, there was none. Winco's determination that they were going to fire her was based upon one incident, and it was June 26, 2011, when she got a cake out of the stales cart. So what was the evidence that she took any fresh cake? Oh, sure. That's my question. Yeah, so. That's right. Is there any? That would be historically based upon her own testimony that, yeah, I did do this, and it was part of the process that I was told was the process I was supposed to follow. And that would be demonstrated in the in-store use logs, but unfortunately they were very sporadically produced and preserved. And so we just don't have the benefit. However, we do know that the other items she testified were taken for in-store use for similar reasons. They do show up in the in-store use log on the few dates that we have. So chips, pop, rolls, deli trays, those sorts of things that she signed for. So is there any contrary evidence on that? I mean, she has her testimony that before we have the stale cake policy that she records things. Is there any evidence that she didn't record things other than that they've lost or misplaced their logs? I don't believe so. I don't believe so. I don't think there's any evidence of that. Okay. I also think something important to consider in this is on the pretext issue, the fact that WinCo could not get its story straight on who actually made the determination to fire Ms. Mays. You've got stories going all over the place of who did what and when, but no one would actually take responsibility for making the decision. And I think that's pretty indicative when an employer can't give you a straight answer as to who did the termination of pretext, and that something else was going on in that situation. So do we have a situation where the testimony from each of these employees who are listed in response to the interrogatory was that somebody else made the decision, it wasn't me? Correct. But I don't know who did? Correct. Yes. So then you go take the deposition of the other witness and the witness says the same thing? Right. And in fact, so the district court concluded in footnote 11 of the decision that it was HR that made the decision. However, the HR 30B-6 representative said, I don't know why people are saying this, but I wasn't. Nobody fired her. Right. We know she got fired, but we don't know how it happened. I mean, we know Scott McCartney did it, but I don't know who made the decision. So I think those are some real critical issues that a jury has to look at those Additionally, regarding the COBRA issue, the district court summarily labeled Ms. Mays' conduct as theft and dishonesty sort of without going into the analysis. And we don't disagree if something is legitimately theft or dishonesty. Sure. Then it would be serious misconduct and the policy would be to deny those benefits. Correct. So if we agree with you that there's a triable issue over whether or not it was, in fact, serious misconduct or rather discrimination, then presumably those issues would also fall as well and would have to go back. Correct. Correct. Right. In fact, do any of the claims – isn't that true of all of the claims? Right. If there's really dispute of fact about why she was terminated, don't all of the claims survive? Is that your position or have I got that wrong? No, I think that's exactly right. So in the COBRA issue, the gross misconduct issue hinges upon whether or not she was, you know, basically terminated for discriminatory reasons, and this whole cake issue really and the practice of it, and as does the Fair Labor Standards Act issue, because the reason that WNCO did not pay out her wages for vacation was based upon that gross misconduct provision in this alleged CBA. So in fact, if we say she didn't commit gross misconduct, I'm not sure that this Court has to actually even reach the CBA issue and whether or not it's enforceable or legitimate, because if she didn't commit gross misconduct, then she's entitled to those wages. Right. Did you want to save your remaining time? I do. Thank you very much. May it please the Court. Dean Bennett for WNCO Holdings Incorporated. WNCO requests that the district court be affirmed and all causes of action be dismissed. I want to make three initial factual points that I think is going to help in context for my argument. The first point, Judge Talmon, you mentioned this issue. We have two employees, one male, one female, on video taking cake. They were interviewed. They were initially suspended, but ultimately they were terminated. That's point one. Mr. Bennett, I would agree with you. If that's all that we had in this record, then I think I would say there's a failure of proof on the part of the plaintiff to establish a tribal issue of fact on pretext, but that ignores all the other evidence that Ms. Mays just went over in great detail as to whether or not there may be a distinction as to why they fired Ms. Mays, even though it may or may not have applied to Mr. McInerney. I'm not sure I buy the argument about, well, he took a fresh cake and not a stale cake. I think the issue is over employee theft. I think this is a contextual fact that I want to have kind of overarching, and then we'll get down into the detailed facts that were raised by counsel. The second point is it's undisputed that the investigation into cakes took place before Steen knew who was involved. She didn't know who was involved. And it's also undisputed that when Steen involved loss prevention, the independent department and WNCO assigned to do investigations, there was one employee involved. It was Nick McNally. He was a male employee. That's how this whole thing got started. The third high contextual point, Mays was terminated for theft and for dishonesty. The dishonesty aspect of Mays' conduct undisputedly had nothing to do with Steen. It had to do with Mays saying, my former manager, Mark Wright, gave me permission to take cakes the way I've taken them. The lead investigator in loss prevention, Don Hook, called Mark Wright after he suspended Mays so he could check out her story, said, Mr. Wright, did you give Mays permission to take cakes? And he said, absolutely not. That's a dishonesty component. And you'll see in the AS400 termination entry, theft and dishonesty, and the dishonesty is because we checked with Mark Wright and Mark Wright said no. So the dishonesty had nothing to do with Steen. She was not a part of that. Mr. Olson testified that this was the policy. His understanding of this had been the practice earlier. Didn't Mr. Olson say that? Mr. Olson testified, along with a number of other people, that there had been cakes in the break room. And there are cakes in the break room under appropriate circumstances. But didn't he also testify that he understood that this was the practice that was okay to take the stale cakes for the freight crew? I think he did, Counsel. I think there's that. That testimony is in the record, isn't it? I don't recall specifically. I know Mr. Olson ---- Well, I mean, the problem is that there's conflicting testimony from WNCO if you take the former employee's testimony and stack it up with the testimony that Judge Christian is referring to, isn't there? I don't think so because in the Valermo case, particularly for the discrimination claim, courts only require an employer honestly believe its reasons for its actions. Loss prevention was the one doing ---- That doesn't ---- that's not the answer to whether there's conflicting testimony. There could be conflicting testimony, but it's not material. Loss prevention talked to Mark Wright. Loss prevention did its analysis. And loss prevention came to the conclusion of dishonesty and theft. Why couldn't a reasonable juror decide that she was fired for gender-related bias? The only connection to gender in any way are the supposed direct evidence, which I'm happy to address those comments specifically. Okay. And then there is the circumstantial evidence. And it needs to be specific and substantial evidence of circumstantial ---- of pretext. Okay. Do you want to start with the direct evidence? I'll start with the direct evidence. Let's talk about the chair of the employee ---- the chair of the safety committee. The undisputed evidence is Steen doesn't determine who's on the safety committee or who the chair is. That's not her decision. So that Mays said another employee told her that Steen took her off the committee, that wasn't even a responsibility of Steen to do. It's not even her job. It was also contextually and in temporal proximity to the termination decision. It was at least six months beforehand and is not connected to a termination. It's separate from a committee and she was already off the committee. Steen wasn't involved in that. And you can look at the testimony. There are about four pages of Ms. Mays' deposition testimony where all these allegations come out. And you can look at those and there is no contextual or proximate connection to the termination decision. Steen wasn't involved in that. Child care. Ms. Mays said, and this is her testimony, I felt like I was putting her out. But Steen's subject, excuse me, Mays' testimony, I felt like I was putting Steen out. Mays' subjective belief about what Steen thought about her child care needs is definitely not direct evidence of discrimination. What the facts are is Steen has children. Steen promotes female employees. There's Steen, there's assistant managers who are females that Steen. Mr. Counsel, you know that the Supreme Court has said that that doesn't, that's not a defense for you. So that's a nonstarter. It is context for a direct evidence claim. And I'll take, let's take Dominguez-Curie, the case that Mays wants to rely on. That's a case where you have Rock Stacy who gives jokes about females' body parts, about their menstrual cycles. Says, I don't want pregnant people here. I mean, there are a litany of about 15 statements and that rises to the level of direct evidence. Or you take the Chao Wang case, Judge Reinhart's decision, where you have two Japanese or two Asian employees and they're called a racial slur and Judge Reinhart says, yeah, that is egregious and bigoted and that rises to the level of direct evidence. Or you have the Cordova case that they rely on where Hawkins uses that same language. You have Hispanic employees and they call them dumb Mexicans and it's the decision maker making those comments. That's direct evidence. We're not there on direct evidence and that's what Judge Lodge determined. I think we need to go through the McDonnell-Douglas burdenship thing. Why isn't it direct evidence if a supervisor says that men would be better in the job? There's no context for that. I mean, she said. No context. There's no context. But she said a, the statement from a third party multiple months, in fact, Mays didn't say when. So are you denying that it was made or are you, I'm just trying to get to the, it seems to me you're taking the position that that's not direct evidence to say that a man would be better than a woman and I'm having a hard time with that one. So I want to give you a chance to respond. With all due respect, she didn't say a male would be better than a female. She said, the testimony is Mays said that Scott told her sometime, we don't know when, and I'm not saying that the statement didn't happen. I'm not trying to create a genuine issue of fact here. What I'm saying is she said a boy, I want a boy instead of a girl. But you know what? There's no context. What are we supposed to do with that?  You don't need any context. You keep talking about context, but you have all these remarks that are gender based. Quite directly. Very directly. So maybe I'm missing the point about context. I disagree that there are all these remarks. There is that one remark. There's several remarks. How about one? She's identified three, but take any one you want. And I really want to hear your response on this. But they seem very direct to me and I think we've been clear on that. So what's your response, please? Okay, the two responses. I think if you look at the testimony and it's at ER 714 to 721, and look for yourself at that testimony, I don't think it rises to the level of direct evidence. Now let's say there's direct animus for Steen. I will concede that point so I can get to another argument. There is an independent investigation by loss prevention, and I want to walk through those facts with you. Bakery manager comes to Steen and says, hey, I think there's a cake upstairs and I don't know why it's there. Steen says, I don't know why there's a cake up there. Let me look. She looks at some records. Geez, there's no reason the cake should be up there. Maybe I'll go look at some video. She looks at some video. Nick McNally. He's there on the video. Steen doesn't go to McNally and say you're fired. She does what she's supposed to. She calls loss prevention and gets loss prevention involved. Tony Cox. We have Tony Cox, Scott Samuelson, and Don Hook, all loss prevention employees, all involved in the investigation. I think an important document in the record is at ER 932. Tony Cox, before knowing anything about Mays, had reviewed video with Steen and had identified only McNally. On 932 is an email, ER 932, it's an email from Cox that goes to Samuelson and to Hook and says, hey, look, we've got an employee. Here's his employee number. His name's Nick McNally. He's taken cakes only when management's not present, meaning that Steen's the ranking official, only when he's not present. We think he's going to do it again tomorrow night. Scott, you better come on over here. Samuelson comes over and sets up a sting. We've had cakes taken. A cake is taken again. He brings McNally up into the investigation room and says, Mr. McNally, you took a cake. Why did you do that? Ms. Mays told me I could take cakes. Okay, well, we're going to investigate a little bit. We're going to suspend you and bring Mays up. Ms. Mays, you took, and she says I took some cakes. She did say, what is the evidence that she took more than one cake? It's her own admission. I took cakes. Right, right, exactly. She didn't deny that. And the reason I took cakes is my former manager, Mark Wright, told me I could take cakes. So Scott Samuelson and Don Hook, the investigator and the lead of loss prevention, say, fine, we'll give you the benefit of the doubt. You're suspended. Go home. Come back in the morning. Let us talk to Mark Wright. Don Hook, the head of loss prevention, calls Mark Wright and says, Mr. Wright, did Katie Mays have permission to take cakes in any fashion? And Mark Wright said, no, I did not say that. So Mays is caught in a lie, and it's dishonesty. If you want to separate the fact of theft and dishonesty, independently, loss prevention on its own determined that Ms. Mays engaged in dishonesty, and that was a basis specifically in a termination document was the basis for termination. Dishonesty and theft both rise to the level of gross misconduct under WinCo's personnel policies. We can get to the COBRA issue and to the CBA issue, but that's how Ms. Mays got terminated was the investigation. Can I ask you a question on the COBRA issue? Is there any cost to the employer? My understanding was that the former employee bears the full amount of the premium for 18 months' worth of COBRA benefits. Your Honor, I'll be honest. I'm not an expert on benefits now as to what the employer's obligation is. I do think there is some cost to the employer, but I couldn't tell you that. Well, there would have to be unless the sole reason for denying the benefit is punitive to further punish the former. It's not punitive, and I think it's consistent with what the statute says. It says if there is a qualifying event, which doesn't include gross misconduct, provide notice of your ability to continue coverage. Oh, so you're saying that if the basis for her termination was, in this case, serious misconduct, then under the law she's not entitled to COBRA benefits. She is not entitled to a notification of continuation of coverage, yes. She could not elect in had she engaged in gross misconduct per the statute. Okay. And I do want to spend a minute talking about the COBRA claim. We have a number of cases. The Food Lion case, which is the Southern District, which is the District of South Carolina, which I think is very instructive on these facts. Congress didn't tell us what gross misconduct is. There's not a regulation that tells us what gross misconduct is. Judge Lodge said, I don't know what gross misconduct is, and the case law is sparse. Food Lion is very instructive. If you look at Food Lion, you have a grocer in the same industry with the same concerns that Winco has. And the way that they took it seriously, they're like, okay, well, we have a benefit plan, and we need to define what gross misconduct is. They had personnel policies, and there was eight that constituted gross misconduct. And the court said, the Food Lion court said, it appears Congress intended each employer to tailor its definition to the needs and exigencies of its own business. And that's what happened here. Winco has its benefits plan, its health benefits plan. ER 385 provides for notice of continuation of coverage except for gross misconduct as defined in ER 382 to 383, the personnel policies. Those include dishonesty and theft. And I think you can take either one of them, the dishonesty or the theft. And I want to go back to the statement I made earlier about the Valermo case. Just to have your point, though, you're saying that the employer gets to define what gross misconduct is? For its industry, yes. That's what the Food Lion case stands for. And theft is a big problem in the grocery industry. Right. Very big problem. So is your position then, I think going back to what you said at the beginning of your remarks, if the employer honestly believed that she had committed theft, without regard to what Ms. Steen may or may not have thought about her, that is an independent ground to justify the termination and the district court's grant of summary judgment in favor of the employer? With the clarification of theft and dishonesty, I think that's absolutely right. Theft and dishonesty. And if a reasonable juror could decide, just to follow up on Judge Tallman's question, if a reasonable juror could decide that there's a genuine issue of material fact about why she was actually terminated, do any of these claims fail at summary judgment? I think the answer— If that's disputed. If it's disputed why she was terminated? Right. No, I don't think so. If it's disputed that she was terminated because of gender and that was the reason, then there's an issue of fact. But I don't think there are materials issues of fact that arise to that level, particularly given the Don Hook, Mark Wright, dishonesty issue. And I want to talk about the Valermo case. It is the law in this circuit and across the country, actually. And the Covardis case, the plaintiff's site for the Cobra issue, addresses this very specifically. Courts only require an employer honestly believe its reasons. If Don Hook honestly believed, lost prevention, honestly believed that she lied or she thieved and terminated her, it doesn't matter if they're wrong. But that is my question. We don't know who terminated her. That's my question. We don't know who terminated her, so how do we know that's the— To whom do we ascribe the reasonable belief? That's my question. We know, and I know there was some chuckling going on about people pointing fingers and depositions. It wasn't that, gosh, you know, I know I was involved. They didn't say they weren't involved. They were all involved. So who made the decision? Who stepped up to the plate and said, I authorized her termination? Anybody? Or is this termination by committee? It was termination by the process. So the committee did it, but no single identifiable company official. This is like GSA. What we know is Steen didn't do it. Steen didn't investigate it. Don Hook came to the conclusion that she lied. And she came to Brad and she said, hey, look, this is what we found. So the lost prevention guy made the decision to terminate her because he was convinced that she'd lied? Is it really not possible to identify who made the decision? You know, recollection, this is in summer of 2011. And I know the court knows, as you go through, and there are 15,000 employees that lost prevention deals with for WNCO. And what happened on what day and who said what exactly when you're asked that question in your deposition, maybe some people would lie and say, you know what, I remember making it. But when you terminate an employee, it's not a question of who did the investigation. The question is, who made the decision to terminate her? It is a collective decision between management that's present, Scott McCartney, who was there, and lost prevention's findings from its report. And it is undisputed. How do we know that? Because, in fact, when you go through the deposition testimony and the interrogatories, all these people were involved in the terminations. You're right. They were involved in the decision. I mean, they're involved. There was the interrogatory question. Well, I'm just saying, how do you know to whom to attribute this honest belief? Because if people were involved in different degrees, although nobody seems to remember exactly, okay, fine. So it seems to me that there may be a factual issue on the honest belief. There is not a factual issue on the honest belief. We have an investigation and a decision from loss prevention that says this is what she did. And the undisputed facts are – But suppose the jury decides, after listening to the evidence and the ambiguities into who made the decision, that it was really Ms. Steen who was driving the decision. So the jury decides she's really the prime mover here. Then wouldn't it be relevant to consider all these comments? I think there would have to be such – there would have to be inferences that are not reasonable, like Steen, on vacation, who didn't start this to target Mays because she didn't even know Mays was involved, called Mark Wright and said, hey, you're about to get a call from Don Hook, who's going to ask you whether you authorized Steen. And Steen didn't know that Mays had said, Mark Wright gave me permission, that that was the justification for her action. She didn't know that. There's no reason to believe that the Mark Wright, Don Hook communication about the dishonesty, which is an independent basis and a good faith basis for termination, and even counsel stood up here and said, if there's dishonesty, we agree. That's a terminable offense and it rises to the level of gross misconduct. But I keep coming back to why couldn't a reasonable juror decide otherwise, given this record, counsel? There's plenty of evidence on the other side of the scale. Your Honor, I respectfully disagree that there's no direct evidence. And I'd like to address the common practice because I think that's something that is troubling, a little bit troubling in the way that it's presented. There's cash paid out slips and there's whatever else Mays said she had authority to do. There is no doubt management can get a cake, financially process it through and account for it in WinCo system, whether it be a cake from the floor or take a stale's cake. In fact, you can't take a stale's cake. There is a process where you can go through, and it's not a common practice. You can't take a stale cake? Can't take a stale cake. And it's a slippery slope. And the Pickle Declaration, which is the undisputed expert testimony that says, look, the grocery industry, if you take two olives off the cart or if you take a cookie off the platter, you can't do that. It's a slippery slope. Profit margins are so narrow, you can't take things. If it's on the ployer's premises, because what happens at the bakery? We understand. Go back to the evidence, if you would, please. The testimony says that was common practice. Excuse me? I think there's testimony. There is not testimony. Read the testimony, and we can talk about, again, we can talk about those. Trent Gallop, Nick McNally, Chris Pierce, Mark Lynch. What they say is cake was in the break room. Okay, cake was. Well, that's not the only evidence. But I know you're out of time, but I asked you earlier about Mr. Olson, for example. It doesn't matter if Mr. Olson thought it was appropriate to take a cake from the sale cart. If Mr. Olson would have done it, Dana Steen's undisputed testimony is, if I would have seen Mr. Olson take a cake from the sales cart, he'd have been fired, just like McNally and just like Mays. Thank you. Thank you. Your Honors, there are just a couple of points I would like to address. The first being the assertion that Ms. Steen did not somehow initiate the investigation. The fact of the matter is she did. No, I think he said they did. That she did. Okay. I'm sorry, because I understand. I think his point simply was at the time she called in loss prevention, she had no idea that Mays was there. He didn't know who. Right. And actually, if you look at the unemployment hearing testimony, and I'm sorry, I wish I could give you the exact page number, but within that testimony, she talks about reviewing the videos, and she included both the Nick McNally video and the Katie Mays video with the sales cart issue. So clearly, Mays was a target from the get-go in this investigation when it was passed on to loss prevention. And the other critical factor in that is the fact that, as Scott Samuelson testified, Ms. Steen told him that the use of cakes in the store had never been allowed, period, which, as counsel acknowledged, is not true. Management certainly, I mean, Wynklee even acknowledges management can use the cakes. So the fact that Ms. Steen is making these false statements to loss prevention about what the allowable practices in the store are is pretty indicative, I think, of her. So what's your answer to this alternative theory that she lied? I mean, she did make a direct statement that Mark Wright told me it was okay, and when they interviewed Wright, Wright flat-out denies that he ever said such a thing. Right. Well, I think, first of all, we're dealing with questions of fact for the jury. This question of who lied is ---- But that's a credibility determination that the jury's going to have to resolve. I do. I think that's a credibility determination. And I think when you look at it in the context of all of the other testimony, including Ms. Mays' testimony, that there were mornings after they'd used a cake, she went directly to Ms. Steen and said, hey, by the way, we used a cake last night, and Ms. Steen would just say, okay, and walk away. Well, with her testimony that Steen was actually eating some of the cakes. Right, right. I mean, I think his answer to that may well be, I wouldn't put words in his mouth, but in terms of there being an honest belief that there was dishonesty or theft, that's all they need to show. Right, and I think the problem is you look at all the people involved in the investigation, and especially Steen as a decision maker, she certainly, I think at a minimum there's a question of fact as to whether there was an honest belief that Mays engaged in any kind of misconduct at all. I think the other thing ---- Of course there's a question of fact, because her direct supervisor says he never told her that. Right. Exactly. Exactly. Right. And I would also very quickly like to address the Food Lion case, which Wynne co-relies upon to assert that an employer should be able to basically define gross misconduct however it wants. But I would note that although counsel was referring to a portion of the Food Lion case where there was a discussion about what does gross misconduct mean, the employer tried to figure out what it meant, that's in the findings of fact section of that case. In the conclusions of law section, they actually go through and analyze a legal definition and partly for the employee who is not a manager, adopt the analysis of the Korbel case, which relies upon State law as far as what the definition of misconduct is. Would you disagree that the category of theft falls within gross misconduct? I mean, I think probably under most circumstances it would fall within gross misconduct. However, you have to actually look at the circumstances surrounding it. I don't think you just get to label something as theft and walk away and plug your ears. I think you have to actually look at what the practices were with the employer and what the employee was informed of. And the whole point of COBRA is to help an employee transition. It's incredibly devastating for an employee to lose insurance. Believe me, we get that part. I guess the question is it is a bit of a slippery slope. If the flat rule is no theft in the grocery industry because our profit margins are so slim, but then we look at all the things that employees took off the shelves of the store, whether it's Windex or a roll of cleaning paper or a stale cake, clearly there are exceptions that the employer doesn't see as theft. Correct. That's correct. But Judge McEwen's question is different. She's saying context aside, just in a hypothetical, if there were a circumstance where an employer decided somebody intentionally stole something, even something of very minor value, is it your position that that would not be gross misconduct? I don't think so. And, again, you'd have to look at the context. But I guess if we're talking about a good-faith belief standard, I would note that in Corbell, the Northern District of California, that court specifically rejected the good-faith standard because COBRA has such a high level, the intent required to commit gross misconduct, it's this outrageous behavior. Well, but let's say she took 25 cents. She was a cashier. She took 25 cents. Well, she did steal money out of the cash register, and you might think that's kind of de minimis. But, and the cake may be de minimis sort of over here, but if she stole 25 cents out of the cash register, would you be making the same argument? That's a good question. I hate to say it, but I think it comes down to context and what they've done with other people in that situation, and with other people in that situation if they've decided that that's theft and that's unacceptable conduct. So, again, it's, I guess, established pattern of practice at the facility. Thank you. Thank you. Thank you both for your argument and your briefing. Mays v. Winco is submitted.
judges: McKeown, Tallman, Christen